William W. VANWINKLE,
Appellant–Defendant,

v.

STATE of Indiana, Appellee–Appellee.

No. 61A05–0107–CR–301.

Court of Appeals of Indiana.

Feb. 28, 2002.

Larry Crawford Thomas, Clinton, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Jodi Kathryn Stein, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

William W. VanWinkle ("VanWinkle") brings this discretionary interlocutory appeal[1] from the Parke County Circuit Court's denial of his Motion to Suppress. He raises three issues for our review, which we restate as:

I. Whether the warrantless arrest of VanWinkle violated the Fourth Amendment of the U.S. Constitution or Article I, Section 11 of the Indiana Constitution; and,

II. Whether the warrantless entry and search of VanWinkle's home violated the Fourth Amendment of the U.S. Constitution or Article I, Section 11 of the Indiana Constitution; and,

III. Whether the search warrant was invalid because it was based upon evidence resulting from an illegal, warrantless search of VanWinkle's residence.

We affirm.

### Facts and Procedural History

The facts most favorable to the non-movant, the State, reveal that Indiana State Police Lieutenant Mark Hartman ("Officer Hartman") received three telephone calls in December of 1999, reporting a strong ether odor emanating from Van-Winkle's mobile home residence, which is located in Rosedale, Indiana. Officer Hartman received the first two calls on Friday, December 17, 1999, and the third call on Sunday, December 26, 1999. Two different individuals placed the December 17 calls; Officer Hartman knew both callers and considered them reliable. Officer Hartman testified that both callers informed him of their suspicions of methamphetamine manufacturing at the residence. The callers reported that they noticed the smell of ether and saw open windows when vehicles were located at the residence.

After receiving the two initial calls, Officer Hartman casually mentioned the information to fellow troopers, although no action was taken. Officer Hartman then received the December 26, 1999 call while he was home on vacation. This caller had also called on December 17. The caller believed the methamphetamine manufacturing was actually taking place at the time of the call on December 26 because of the strong ether odor, the presence of cars at the residence, and open windows in the residence. After this call, Officer Hartman called the police post and asked that a trooper be assigned to drive by the residence and confirm the information relayed in the telephone call. Tr. pp. 9–21.

Pursuant to Officer Hartman's call to the police post, Indiana State Police Offi-

1. *See* Ind. Appellate Rule 14(B).

cer Tony Guinn ("Officer Guinn") was assigned to investigate the odors and open windows. Within thirty minutes of being contacted, at approximately 12:15 p.m., Officer Guinn drove by VanWinkle's residence. He, too, noticed a strong ether odor and noticed more than one open window on the southeast side of the residence. He also observed a fan in one of the windows, which he believed to be drawing air out of the residence, and three vehicles parked in the driveway. Tr. pp. 28–31. Although his experience with methamphetamine laboratories was limited, Officer Guinn suspected the manufacture of methamphetamine at VanWinkle's residence. Officer Guinn contacted the Parke County Sheriff's Department because he was aware that the department had been involved in several methamphetamine-manufacturing cases. Tr. p. 30.

Within an hour, Office Guinn drove to the home of Deputy Kneeland of the Parke County Sheriff's Department to discuss the telephone calls and his observations. There he met with Parke County Sheriff Charles Bollinger, Chief Deputy Norm Camerer, Deputy Jack Shannon, Reserve Deputy Bratcher and Deputy Kneeland. Tr. pp. 32, 78. The officers discussed the situation and decided that they immediately needed to investigate the matter further because they knew that although possession of ether alone in Indiana is not illegal, it might be a precursor for the illegal manufacture of methamphetamine.

The group relied heavily on Sheriff Bollinger's expertise in the manufacture of methamphetamine. Before his election as Sheriff, Bollinger had previously worked sixteen years as a trooper and ten years as an investigator for the Indiana State Police. And, although he had only been Sheriff of Parke County for two and a half years, during that time period he had been involved in the investigation of about twenty-four methamphetamine lab cases. Tr. pp. 77–78. Sheriff Bollinger was concerned that delay in getting to the residence would ruin any chance of potentially finding a methamphetamine lab because he knew that production of methamphetamine takes only four to six hours and that such a lab can be dismantled very quickly. Tr. pp. 80, 83. Sheriff Bollinger's other concern was that such labs are dangerous because of the explosive nature of the chemicals used in methamphetamine manufacture. For these reasons, the officers decided to go to the residence, knock on the door, and ask for consent to search. Tr. pp. 82–84.

Upon arrival at the residence, at approximately 1:25 p.m. on December 26, 1999, the officers parked in the driveway and immediately noticed the smell of ether. Officer Guinn and Sheriff Bollinger approached the front door of the residence, and Officers Shannon, Camerer and Kneeland went to the rear of the residence. Tr. p. 84. Built onto the back of the residence was a rough, wood-framed windbreak and entry area. When Officer Guinn and Sheriff Bollinger approached the front door, they noticed an open window "with a fan in it apparently extracting the ether odor from inside the . . . mobile home." Tr. p. 85. They also saw a propane tank on the ground next to the front porch, whose original valve had been replaced with a ball valve connected to a steel reinforced hose. The lower half of the tank was covered in a thick frost and the tank's replacement valve had a bluish green tint, which Sheriff Bollinger believed to be consistent with a tank containing anhydrous ammonia (a chemical he knew is used to manufacture methamphetamine). Both officers believed the tank contained anhydrous ammonia. Tr. pp. 33–34, 85, 98.

Officer Guinn and Sheriff Bollinger knocked at the front door of the residence

and Sheriff Bollinger announced their presence by shouting out his identification as Sheriff. After making the announcement, he heard someone's footsteps running toward the back of the residence. Tr. p. 85. VanWinkle then exited the back door of the residence, left that door open, stepped down about three stairs into the wood-framed entry area, and made his way through it to a door to the outside. Officer Shannon was standing outside the wood-framed entry area and met VanWinkle as he opened the door. Tr. p. 163. When Sheriff Bollinger heard the footsteps heading toward the back of the residence, he made his way to the back of the residence to see what was occurring. He found VanWinkle being handcuffed by Officer Shannon, together with Officers Camerer and Kneeland, outside the wood-framed entry area. Tr. p. 164. Sheriff Bollinger also noticed the back door of the residence open. Sheriff Bollinger looked through the open door of the wood-framed entry area, looked across the area, and noticed a jar containing a liquid substance atop a washer or dryer just inside the open door to the residence. Tr. p. 86.

After patting down VanWinkle, but before handcuffing him, Officer Shannon asked VanWinkle, "Are you cooking meth?" VanWinkle testified at the suppression hearing as to his response: "And I stated, 'I have nothing to say.' I enacted my Miranda rights. I am familiar with somewhat [sic] criminal procedure and law." Tr. pp. 164–66. Subsequent to his arrest, VanWinkle never authorized the officers to search the residence. Nevertheless, before he reentered the residence, an officer asked VanWinkle if anyone was inside, and VanWinkle responded, "Yes, my wife is asleep in bed and I have a friend inside." Tr. p. 167. The officers

thereafter entered the residence with VanWinkle to find the people in the house and conduct a protective sweep. They took Sara VanWinkle ("Sara"), who was asleep in a bedroom, and Kelvin Heyen ("Heyen"), who was using the bathroom, into custody.

While Sara and Heyen were being located, VanWinkle was first standing with Officer Shannon near the kitchen of the residence. At this point, Officer Guinn was let into the residence by way of the front door. When Officer Guinn stepped into the residence, he noticed a loaded SKS rifle atop the refrigerator. The rifle was taken into police possession at that time. Officer Guinn then led the barefooted VanWinkle to the couch, inspected under its cushions, and seated VanWinkle there while Sara and Heyen were detained. Tr. pp. 171–72. Shortly thereafter, VanWinkle, Sara and Heyen were removed from the residence. Tr. pp. 88–89, 111. Sheriff Bollinger then instructed some of the officers at the scene to keep the residence secure and remain outside of the residence while Officer Guinn obtained a search warrant. Tr. p. 113. The total elapsed time between the officers' arrival until all three suspects were removed from the residence was approximately ten to fifteen minutes. Tr. p. 173. Officer Guinn obtained and executed a search warrant later that afternoon.

The State filed its Information on December 29, 1999, and on February 4, 2000, it amended Count I, and added Count IV. The Information charged VanWinkle with two counts of Dealing in a Schedule II Controlled Substance,[2] as Class B felonies, one count of Possession of a Controlled Substance,[3] as a Class D felony, and one count of Possession of Two or More Chem-

---

**2.** *See* Ind.Code § 35–48–4–2(a)(2)(C) (1998).

**3.** *See* Ind.Code § 35–48–4–7 (1998).

ical Reagents or Precursors with Intent to Manufacture,[4] as a Class D felony. Appellant's App. pp. 5–7, 25.

On March 12, 2001, VanWinkle filed a Motion to Suppress, requesting that the trial court suppress all of the evidence seized as a result of the search of his residence. He alleged that the initial search was conducted without a search warrant and without probable cause in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution and Article I, Section 11 of the Indiana Constitution, and that the initial search was not incident to a valid arrest. Appellant's App. pp. 73–76. The trial court held hearings on the motion on April 6, 2001 and May 11, 2001, and then on May 17, 2001, the trial court denied VanWinkle's motion. VanWinkle properly filed this Discretionary Interlocutory Appeal pursuant to Indiana Appellate Rule 14. Additional facts will be provided as necessary.

## Discussion and Decision

Our review of a denial of a motion to suppress is similar to our review of other sufficiency matters. *Goodner v. State,* 714 N.E.2d 638, 641 (Ind.1999). The trial court's decision must be supported by substantial evidence of probative value. *Id.* We will not reweigh the evidence, and any conflicting evidence is considered in a light most favorable to the trial court's decision. *Id.*

4. *See* Ind.Code § 35–48–4–14.5 (1998).

5. The Fourth Amendment of the U.S. Constitution reads:
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## I. Warrantless Arrest

### A. *Investigatory Approach*

 VanWinkle first argues that the officers had no right to be at the front or rear door of his residence. The Fourth Amendment analysis of this issue looks to "whether a person has a 'constitutionally protected reasonable expectation of privacy' " in the area at issue. *Shultz v. State,* 742 N.E.2d 961, 964 (Ind.Ct.App.2001), *trans. denied,* (quoting *Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (citations omitted)). Under Article I, Section 11 of the Indiana Constitution, a case is analyzed with a reasonableness standard using specific facts of each case. *Id.* (citing *Brown v. State,* 653 N.E.2d 77, 79 (Ind.1995)).[5]

In *Shultz,* the police went to Shultz's residence because he was a suspect in an investigation of a semi-tractor theft. After parking in Shultz's driveway, the officers approached the back door and knocked, but no one answered. The *Shultz* court found that the officers' initial entry onto the land did not violate the Fourth Amendment because the police came onto the property for a legitimate reason, to conduct an investigation, and that the initial entry was properly restricted to the driveway and walkway. *Id.* at 964. Additionally, the court did not express any concern with the approach and knock on the back door of the residence under the Fourth Amendment, even though it found that

Article I, Section 11 of the Indiana Constitution reads:
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

subsequent searches of other outbuildings on the property violated the Fourth Amendment. *Id.* Likewise, the court found that the initial entry onto Shultz's land to conduct an investigation and to approach and knock on the residence door to inform the owner of the police visit were reasonable under Article I, Section 11 of the Indiana Constitution. *Id.* at 965–66.[6]

■ The initial entry onto the land, the approach and knock on the residence door in *Shultz* are similar to the circumstances of our case. Here, the police went to VanWinkle's residence for a legitimate reason, to conduct an investigation. Upon entering the property, the police did not stray from places that visitors to the property could be expected to go when they parked in VanWinkle's driveway and approached the residence, and they did not later stray from the front and rear entrances of VanWinkle's mobile home in order to reveal something that was otherwise hidden from their view. Because the front and rear entrances to VanWinkle's residence were not places where VanWinkle had a constitutionally protected reasonable expectation of privacy, we conclude that the initial entry onto the land, approach, and knock on the door of VanWin-

kle's residence did not violate the Fourth Amendment. For these same reasons, we also conclude that their initial entry and their approach and knock at the residence were reasonable conduct under Article I, Section 11 of the Indiana Constitution.[7]

### B. *Probable Cause*

■ VanWinkle next argues that there was no probable cause for his arrest. The Fourth Amendment of the U.S. Constitution and Article I, Section 11 of the Indiana Constitution require that an arrest or detention for more than a short period of time be justified with probable cause. *Overstreet v. State,* 724 N.E.2d 661, 663 (Ind.Ct.App.2000) (citing *Woods v. State,* 547 N.E.2d 772, 778 (Ind.1989), *overruled on other grounds by Richardson v. State,* 717 N.E.2d 32 (Ind.1999)). An arrest is the "taking of a person into custody, that he may be held to answer for a crime." Ind.Code § 35–33–1–5 (1998). An officer may arrest a person without a warrant if the officer has "probable cause to believe the person has committed or attempted to commit, or is committing or attempting to commit, a felony." Ind.Code § 35–33–1–1(a)(2) (1998). "Probable cause to arrest

---

**6.** On the other hand, the *Shultz* court found that wiping mud from the vehicle's frame in the wheel-well of a semi-tractor violated the Fourth Amendment because such an action "exposed something previously hidden to police[,]" and was not reasonable conduct under Article I, Section 11, but concluded that the inevitable discovery exception to the exclusionary rule would permit the introduction of the evidence nonetheless. *Id.* at 965.

**7.** It is important to note that had VanWinkle answered without opening the door after Sheriff Bollinger knocked, he could have properly refused consent to enter and search the residence, thereby putting this case into a very different search and seizure posture. We agree with a panel of this court that in dicta, our supreme court in *Cox v. State,* 696 N.E.2d 853 (Ind.1998), expressed concern about the

police practice of causing a person to come into public view (by answering the police knock at the residence door) and then entering the residence without a warrant. *Adkisson v. State,* 728 N.E.2d 175, 178 (Ind.Ct.App. 2000). As quoted in *Adkisson,* the *Cox* court stated:

> Opening the door to ascertain the purpose of an interruption to the private enjoyment of the home is not an invitation to enter, but rather is a common courtesy of civilized society. Attendant to this courtesy is the ability to exclude those who are knocking and preserve the integrity of the physical boundaries of the home.

*Id.* (citing *Cox,* 696 N.E.2d at 858 (citing *United States v. Berkowitz,* 927 F.2d 1376, 1387 (7th Cir.1991))).

exists where the facts and circumstances within the knowledge of the officers are sufficient to warrant a belief by a person of reasonable caution that an offense has been committed and that the person to be arrested committed it." *Overstreet,* 724 N.E.2d at 663 (citing *Brinegar v. U.S.,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Whether evidence is sufficient to meet the probable cause requirement is determined on a case-by-case basis. *Peterson v. State,* 674 N.E.2d 528, 536 (Ind.1996) (citing *DiTommaso v. State,* 566 N.E.2d 538, 540 (Ind.1991)).

■ A police officer may also detain a person for investigatory purposes if the officer has a reasonable suspicion that the person is involved in criminal activity. *Overstreet,* 724 N.E.2d at 663. And, "[t]he facts supporting a reasonable suspicion that criminal activity is afoot must rise to a minimum level of objective justification to be valid." *Dowdell v. State,* 747 N.E.2d 564, 566 (Ind.Ct.App.2001), *trans. denied,* (citing *Burkett v. State,* 736 N.E.2d 304, 306 (Ind.Ct.App.2000)).

The officers' reasonable suspicion at the time of their arrival at VanWinkle's residence matured into probable cause as the officers at the front door recognized that the converted propane tank likely contained anhydrous ammonia and when VanWinkle fled from the officers at the front door by exiting the back door of the residence. After Sheriff Bollinger knocked on the front door of the residence and announced the police presence, rather than answering the knock, VanWinkle ran to the back door of the residence, opened the back door, went down the steps of the residence and attempted to exit the wood-framed entry area.[8] It was at this point that the three officers standing outside the door to the entry area (just in case anyone inside attempted to flee the residence) met VanWinkle.

■ At the time of VanWinkle's arrest, the officers at the rear of the residence were aware of the reports made to Officer Hartman of strong ether odors when cars were present and of suspected methamphetamine manufacturing. The officers were aware, either by their own knowledge or the shared knowledge of the other officers involved, that the illegal manufacture of methamphetamine requires the use of ether, although possession of ether alone is not illegal in Indiana. Also, from the time the officers arrived at the residence, they gained first-hand knowledge of the strong ether odors, the presence of cars in the driveway, and the residence's open windows and fan drawing air out of the residence in mid-winter weather. The officers at the rear of the residence knew that Sheriff Bollinger and Officer Guinn were going to knock on the front door, announce the police presence, and request consent to search the residence. These facts and circumstances within the knowledge of the officers at the rear of the residence were "sufficient to warrant a belief by a person of reasonable caution that an offense [had] been committed and that the person to be arrested committed it." *Overstreet,* 724 N.E.2d at 663 (citing *Brinegar,* 338 U.S. at 175–76, 69 S.Ct. 1302).

**8.** VanWinkle does not argue that the threshold of his residence was the back door of the trailer or the door leading out of the wood-framed entry area. VanWinkle also does not argue that the officers improperly removed him from the residence. When VanWinkle opened the door on the wooden structure, Officer Shannon asked him to step outside. VanWinkle complied. Nevertheless, we believe that if the door on the wooden structure were to be considered the threshold of the residence, even though Officer Shannon was carrying a shotgun, VanWinkle could have rightfully refused to step outside. *See* fn. 7, supra.

## II. Warrantless Entry

■ VanWinkle next argues that the officers' warrantless entry into the residence after VanWinkle's arrest was improper and that all evidence seized should therefore be suppressed. The U.S. Constitution and the Indiana Constitution provide different tests for determining whether there has been a violation of the right to be free of unreasonable search and seizure in such circumstances. "Federal Fourth Amendment law protects citizens, . . . from warrantless searches of places or items in which the individual has an actual, subjective expectation of privacy which society recognizes as reasonable." *Trowbridge v. State*, 717 N.E.2d 138, 143 (Ind.1999) (citing *United States v. Doe*, 801 F.Supp. 1562, 1572 (E.D.Tex.1992)). The Fourth Amendment does not cover observations made from vantage points accessed when the police enter private property to conduct an investigation or for another legitimate reason when the police restrict their movements to places where visitors would generally go, i.e., driveways, sidewalks, porches. *Shultz v. State*, 742 N.E.2d 961, 964 (Ind.Ct.App.2001), *trans. denied,* (citing 1 Wayne R. LaFave, *Search and Seizure* § 2.3(f), at 506–08 (3d ed. 1996) (footnotes omitted)). Exceptions to the Fourth Amendment's search warrant requirement before lawful entry "include risk of bodily harm or death, aiding a person in need of assistance, protecting private property, or actual or imminent destruction or removal of evidence before a search warrant may be obtained." *Harless v. State*, 577 N.E.2d 245, 248 (Ind.Ct.App.1991) (citing *Sayre v. State*, 471 N.E.2d 708, 714 (Ind.

Ct.App.1984), *cert. denied,* 475 U.S. 1027, 106 S.Ct. 1226, 89 L.Ed.2d 336).

■ Analysis under Article I, Section 11 of the Indiana Constitution turns to the specific facts of each case and whether police conduct is reasonable in light of the totality of the circumstances. *See Trowbridge,* 717 N.E.2d at 144; *Shultz,* 742 N.E.2d at 964 (citing *Brown v. State,* 653 N.E.2d 77, 79 (Ind.1995)).

As discussed above, the officers had probable cause to arrest VanWinkle. Therefore, at the point that VanWinkle was arrested outside of the residence, the officers suspected that VanWinkle was manufacturing methamphetamine, which they knew to be a process that could be torn down very quickly, and which they knew to be highly volatile because of the explosive nature of the chemicals used in the manufacturing process. Additionally and importantly, before entering the residence, Officer Kneeland asked VanWinkle if there were any other people in the residence, and he responded that there were two other people in the residence: his wife and his friend.[9] The combined knowledge of the fact that the manufacture of methamphetamine can be very dangerous and the fact that there were still other people in the residence would cause any reasonable police officer to see the immediate need to remove any remaining persons from the residence.

The officers entered the residence in an attempt to secure the premises from possible explosion and to remove Sara and Heyen from the residence in order to protect themselves, the remaining people in the

---

9. The record does not indicate at what point VanWinkle was Mirandized. And, even though VanWinkle did not raise the issue here, any such issue would be waived because he did not raise the issue in his Motion to Suppress. *See* Appellant's App. pp. 73–76; *Banks v. State,* 578 N.E.2d 667, 668 (Ind.

1991) (citing *Whittle v. State,* 542 N.E.2d 981 (Ind.1989)). Additionally, VanWinkle's statement at the time of his arrest (that his wife and friend were inside the residence) was not of an incriminating nature so as to require the invoking of the Miranda warnings. *Id.*

residence, and any possible evidence in the residence. The officers found Sara asleep in a bedroom and Heyen in the bathroom. VanWinkle testified that upon finding Sara, the officers gave her some time to get dressed before taking her into custody. Tr. p. 174. He also testified that when the officers found Heyen in the bathroom, Heyen was very argumentative. Tr. p. 113, 174. There was additional testimony that the officers looked into another bedroom briefly before seating VanWinkle near the dining room and kitchen. He admits, however, that the officers were only in the residence for approximately ten to fifteen minutes.

 The State argues that there were two legitimate justifications for the entry into and search of the residence: to conduct a protective sweep and to preserve evidence. We agree. Under the facts and circumstances before us, these justifications fall within the exceptions to the federal warrant requirement. *Harless,* 577 N.E.2d at 248 (citing *Sayre,* 471 N.E.2d at 714).

Additionally, under Article I, Section 11 of the Indiana Constitution, the entry into the residence was reasonable because, had the officers taken the time to get a search warrant at that point, the people remaining in the residence could have been injured by the volatile manufacturing process, could have destroyed evidence, and/or could have attempted to inflict harm upon the officers or others. We

therefore conclude that the officers' entry into and search of the residence in order to protect themselves and others from bodily harm and in order to preserve any evidence was justified under both the Fourth Amendment of the U.S. Constitution and Article I, Section 11 of the Indiana Constitution.[10]

### III. Search Warrant

A search warrant may only be issued upon a showing of probable cause, supported by oath or affirmation. Ind.Code § 35-33-5-1 (1998). VanWinkle does not argue that the officers lacked probable cause to get the search warrant. Rather, he argues that the initial entry and search were illegal, and therefore the subsequent warrant was illegal and all evidence obtained thereby must be suppressed. Because we conclude that the warrantless arrest, entry and search were justified and reasonable, we conclude that the subsequent search warrant issued later that same day was properly granted, and the evidence obtained thereby should not be suppressed.

### Conclusion

We conclude that the warrantless arrest of VanWinkle outside of his residence was supported by probable cause. We also conclude that the warrantless entry and search of VanWinkle's residence were justified in order to protect the police and others from bodily harm and to prevent the possible destruction of evidence. Lastly, we conclude that the search warrant

---

**10.** At one point, VanWinkle complains that one officer searched drawers in the kitchen. Br. of Appellant at 19. None of the testifying officers testified that any such search took place. We will not reweigh the evidence before the trial court, and we consider any conflicting evidence in a light most favorable to the trial court's decision. *Goodner,* 714 N.E.2d at 641.

VanWinkle also complains that Officer Guinn conducted a search of the couch cushions prior to seating VanWinkle on the couch while the other officers gathered Sara and Heyen. Br. of Appellant at 19. Officer Guinn testified that he sat VanWinkle on the couch because VanWinkle was not wearing shoes. Tr. p. 63. Although VanWinkle was handcuffed, this search was clearly conducted for protection purposes because weapons can easily be hidden in and near furniture.

was not illegally obtained. Therefore, because we conclude that there was substantial evidence to support the trial court's denial of VanWinkle's Motion to Suppress, we affirm.

Affirmed.

BROOK, C.J., and RILEY, J., concur.