**Betty WEIS and Michael Weis,
Appellants–Defendants,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 26A04–0305–CR–226.**

Court of Appeals of Indiana.

Dec. 16, 2003.

---

Anna Devoy Clutter, Princeton, IN, Attorney for Appellant, Betty Weis.

James G. McDonald III, Princeton, IN, Attorney for Appellant, Michael Weis.

Steve Carter, Attorney General of Indiana, Andrew A. Kobe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Michael Weis and Betty Weis appeal the interlocutory order that partially denied their joint motion to suppress.

We reverse.

### ISSUE

Whether the trial court erred in partially denying the Weises' joint motion to suppress.

### FACTS

Sometime in January 2003, the Weises were contacted by the Owensville Police Department and the Gibson County Division of Child Protection Services regarding an allegation that their children J.W., age two, and J.S., age seven, were in danger. An investigation revealed:

> "two (2) handguns and a long gun . . . in the kitchen area that were within reach of both children. Also observed were trash bags lying throughout the home, some had been apparently torn open by some or all of the dogs inside the home. There was a strong smell of garbage, dog feces and dirty diapers. Also seen were many roaches. However, there did appear to be sufficient heat.

(App. 12). The children were temporarily placed with relatives, and services were provided for the Weises. On February 7, 2003, Betty signed an Informal Adjustment with the Gibson County Division of Family and Children and Child Protection Services wherein she agreed to work with a parent aide, have J.W. evaluated by First Steps, and keep the home clean and safe. Mike did not sign the agreement, and the agreement was not filed with the trial court. At some point, Mike had verbally "agreed to work with service providers." (Tr. 39). Sometime prior to March 2003, the children were returned to the Weises.

Gina Hertel, a parent aide, was "assigned to the family through Child Protective Services" to discuss parenting and housekeeping issues. (Tr. 5). Hertel was assigned to visit with the Weises one time

per week, at which time she would arrange the visit for the following week. Usually on the occasions that no one answered the door, Hertel would return to her van, write the Weises a note, "go back, knock again, and leave [the note] and leave." (Tr. 6). At some point in early March when no one responded at the residence, Hertel contacted J.S.'s school. The school nurse conveyed her concern to Hertel regarding J.S.'s hygiene. However, Hertel did not seek to remove the children from the Weises' home at that time.

Subsequently, on March 21, 2003, Hertel went to the Weises for a home visit. The visit that day had been scheduled by leaving a note the previous week. Hertel knocked on the door when she arrived. She saw that the living room lights and the television were on. Also, she observed the dogs in the home. She yelled: "If there is anyone in there, hello, I'm out here." (Tr. 6). Hertel became "concerned because [she] hadn't been able to get into the house for three weeks." (Tr. 7). Instead of returning to her van to write the Weises a note, Hertel telephoned the Weises' case manager and then went to the Owensville Police Department to secure assistance. The case manager, Ann Sulawske, contacted Owensville Police Officer, Roger Leister. Officer Leister told Sulawske that he could not enter the home. Sulawske said she had authority to check the house and that she only needed to see inside. After meeting at City Hall, Hertel, Sulawske,

and Officer Leister returned to the Weises' residence.

Based upon Hertel's information, Sulawske went to the home with the intention of removing the children.[1] Sulawske asked Officer Leister to accompany them because she knew of the presence of the guns at the house. Sulawske and Officer Leister[2] "knocked on the door, and as [she] knocked on the door, it pushed open a little bit. Meaning it wasn't locked or shut all the way. So [she] pushed it open and hollered into the house." (Tr. 26). At the time she pushed the door, it was open a "couple of inches," and then she "stepped a foot or two in and hollered."[3] (Tr. 37). Officer Leister stepped behind Sulawske. From upstairs, Mike responded that he would come downstairs. Sulawske observed:

> Overflowing ashtrays and the trash and litter on the floor and then the dog room was right there, where's there's a big window where the poor dog's (sic) live in nothing but urine and feces all over the place. And then you can look right into the kitchen and I could see the bags of trash overflowing and the open containers of food and it was just in disarray. It was just a mess.

(Tr. 27). Also, Sulawske observed gun cases on the kitchen table.

Sulawske asked Mike the whereabouts of the children and told him that she intended to remove the children because the condition of the house was not acceptable.

---

1. Sulawske testified to the above in response to a query as to her decision to request a police presence when she went to the Weises' house; however, on cross-examination she clarified that she had not made the determination to remove the child(ren) until she observed the conditions of the house that day. (Tr. 25, 31, 37).

2. Officer Leister testified: "I knocked on the door, several times, no one would come to the door. I kept knocking on it, finally, the door

had just gradually just started rolling open. At that time, Ann said she's seen enough. You know, that the house was still in the same shape that it was the last time she was there. And she entered the house to check the welfare of the children." (Tr. 43).

3. Officer Leister testified that the door "opened about a foot, a foot and half wide." (Tr. 56).

J.W. was upstairs in the house at the time; however, J.S. was at school. Mike became very upset, confrontational, belligerent, and loud, and he was cursing. Because Officer Leister was concerned that Mike would return with weapons, he accompanied Mike upstairs to remove J.W. from the house.

As the group was leaving the house with J.W., Mike slammed the front door causing the glass to shatter. The glass struck Officer Leister. Officer Leister opened the door, placed Mike in handcuffs, and arrested Mike for Neglect of a Dependent. Officer Leister placed Mike in the police car and gave him *Miranda* warnings. Then Officer Leister reentered the house and took pictures of "dog feces, dirty diapers, and the dead mice." (Tr. 53).

On March 26, 2003, Mike was charged with Neglect of a Dependent, as a class D felony. Betty was also charged with Neglect of a Dependent, as a class D felony.

On April 3, 2003, the Weises, by separate counsel, filed a joint motion to suppress the evidence discovered at their residence on March 21, 2003, "including the testimony of officers, all physical evidence, and all other evidence resulting from the illegal search of" their house. (App. 15). A hearing was held that day. Hertel, Sulawske, and Officer Leister all testified. At the close of the hearing, the trial court ruled that "the photographs taken after the arrest will be excluded. Court finds that there was no search until the arresting officer started investigating." (App. 2, 7, 18). The court explained that at trial the witnesses would be allowed to testify as to what they saw when they entered the house, but the photographs would be excluded.

Additionally, at the close of the hearing, the trial court noted that the evidence suggested that Mike could have been charged with battery on a police officer.

The next day, April 4, 2003, the State filed a second count charging Mike with Battery on a Law Enforcement Officer, as a class A misdemeanor.

The Weises filed motions to correct error regarding the partial denial of the joint motion to suppress. The court denied the motions to correct error. At Mike and Betty's request, the trial court certified the partial denial of the motion to suppress for an interlocutory appeal.

Additional facts are supplied below as necessary to our analysis.

## DECISION

■ The Weises argue that the trial court erred in partially denying their joint motion to suppress the evidence. The gravamen of their argument is that the Department of Children's Services representatives and the police created the emergency upon which the State relies for the exception to the warrant requirement of the Fourth Amendment. In essence, they contend that the State failed to present evidence of exigent circumstances to allow a warrantless entry into their house. We agree.

> Our standard of review for the denial of a motion to suppress evidence is similar to other sufficiency issues. We determine whether substantial evidence of probative value exists to support the trial court's denial of the motion. We do not reweigh the evidence and we consider conflicting evidence most favorably to the trial court's ruling. However, this review is different from other sufficiency matters in that we must also consider uncontested evidence that is favorable to the defendant.

*Simmons v. State*, 781 N.E.2d 1151, 1153–54 (Ind.Ct.App.2002) (citations omitted).

■ The Fourth Amendment of the United States Constitution provides:

The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

The Fourth Amendment protection against unreasonable search and seizure has been extended to the states through the Fourteenth Amendment. *State v. Friedel*, 714 N.E.2d 1231, 1237 (Ind.Ct.App.1999). The United States Supreme Court has said that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). "The fundamental purpose of the Fourth Amendment is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes and their belongings." *Friedel*, 714 N.E.2d at 1237 (citing *People v. James*, 163 Ill.2d 302, 206 Ill.Dec. 190, 645 N.E.2d 195, 197–98 (1994)) (citing *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238, 245 (1979)). "Thus, searches and seizures inside a home without a warrant are presumptively unreasonable." *State v. Straub*, 749 N.E.2d 593, 597 (Ind. Ct.App.2001). "The arrest of a person is quintessentially a seizure." *Id.* at 598.

Narrowly drawn exceptions to the warrant requirement do exist. *Id.* "Exigent circumstances have been found: (1) where a suspect is fleeing or likely to take flight in order to avoid arrest; (2) where incriminating evidence is in jeopardy of being destroyed or removed unless an immediate arrest is made; (3) where a violent crime has occurred and entry by police can be justified as means to prevent further injury or to aid those who have been injured; and (4) in cases that involve hot pursuit or movable vehicles." *Id.* at 597–98. It is the third factor upon which the State relies here.

A variant on that factor has been described in a less stringent fashion as allowing a warrantless search when done "to aid a person in need of assistance." *Willis v. State*, 780 N.E.2d 423, 428 (Ind.Ct.App. 2002). Nevertheless, close examination of the evidence discloses that the State has failed in its burden as to either formulation of the factor.

At the suppression hearing, Hertel testified that on past occasions she had encountered Mike when Betty was not at home. Based upon his demeanor, she believed that he was "non-receptive or intimidating physically. Not wanting to visit." (Tr. 9). Further, she explained that on March 21, she consulted with Sulawske and determined that a "welfare check" was in order. (Tr. 8–11). Hertel testified that the "protocol" implemented by her supervisor required her to obtain police assistance to perform a "welfare check." (Tr. 11). She testified, "That's my protocol. Call the case manager, and they have to get local law enforcement to go to the home to do a welfare check." (Tr. 11).

During a colloquy with the court, Hertel stated: "When I go to visit, generally, we go in the home. When someone blocks the doorway and gives a defensive posture, ... they're not receptive to a visit. And I don't have authority to go in." (Tr. 10).

Hertel engaged in the following colloquy with counsel for Betty:

Q. Okay. Did you attempt at any time to get court—get the Court's authority to go into the house?

A. No I did not.

Q. Are you telling this Court the, and me, that the only reason that you did—went to the house with the

police officers was because you hadn't seen the children in three weeks?

A. It's because I hadn't seen the conditions of the home in three weeks. At a previous visit when they did not let me in, I went to the school to check and make sure the child was in school, some things that were brought up at the school gave me more concern as to the living conditions in the home.

Q. But in those three weeks, you never tried to contact Mrs. Weis through her place of employment?

A. No. I try not to make it a practice to interfere with their employment.

Q. When you came back to the house, why did you bring the law enforcement?

A. It's protocol. When I cannot get in the home and I want to do a welfare check, I have to contact the case manager and—which has to contact law enforcement because that—they bring them, they have the authority to—

(Tr. 12–13).

Hertel testified that Sulawske opened the door and entered the home without obtaining consent from any of the occupants. (Tr. 16). Hertel did not see Sulawske turn the knob to the door. Sulawske testified that her decision to enter the home, and remove the one child there at the time, was based upon the cleanliness of the house. Sulawske acknowledged that the Informal Adjustment signed by Betty did not contain a provision that allowed Child Protection Services to enter the house without permission. (Tr. 35).

On cross-examination, in response to a query as to whether Sulawske had informed him of a need to see anything prior to removal of the children, Officer Leister stated that:

Yes, I do recall telling her that, you know, I couldn't just go out and open the door and walk in. She advised me that she knew that. She said that if he was there, all she needed to do is just to be able to see the inside of the house and if it was still in the same shape it was, then she had, according to her job, she had rights to go in and check the welfare of the children.

(Tr. 56).

Further, Officer Leister explained his actions after he placed Mike under arrest for Neglect of a Dependent:

Q. But didn't you go about the house, from room to room?

A. I just went into the three rooms downstairs and went up the steps and took a picture of upstairs and walked right back out.

Q. Did Mr. Weis give you permission to go about his house after he was placed in custody to take pictures?

A. No sir.

Q. Did he give you permission to go from room to room to observe anything in those rooms?

A. No sir.

Q. Did you have a warrant to do that?

A. No sir.

Q. Did you have a warrant to take pictures?

A. No sir.

(Tr. 50).

The police and government agents speculated that Mike could have been dangerous and that the living conditions might not have improved from the last visit when they decided to meet at City Hall, return to the house, knock on the door repeatedly until the door swung open, and enter the house. The uncontroverted facts most fa-

vorable to the Weises reveal that the police and government agents did not act with a sense of urgency. They had no facts that were different than the suspicions they had over the preceding three-week period when the Weises failed to keep home visit appointments. In all likelihood, if Hertel believed that the children were in immediate danger she would have called the police and not left the home. Instead, Hertel telephoned her case manager and met the case manager and the police officer at City Hall. There the group coordinated the return to the Weises' residence. It is patently obvious that the timing was such as to allow for presentation of the facts to an independent magistrate in order to request a warrant.

Further, implicit in Officer Leister's testimony was his recognition that he could not enter the house without a warrant. Sulawske acknowledged that she would have to see inside the house to procure probable cause. Therefore, it is evident that the police officer and the government agents did not have probable cause to enter the house prior to actually entering the house without a warrant. *Cf. State v. Williams*, 615 N.E.2d 487, 488–89 (Ind.Ct. App.1993) (police could not rely upon emergency they created to support a warrantless intrusion into house).

Here, the State failed to carry its burden to demonstrate that exigent circumstances existed such that the warrantless entry was reasonable. The trial court therefore erred in partially denying the Weises' motion to suppress.

Reversed.

BARNES, J., concurs.

MAY, J., concurs with separate opinion.

MAY, Judge, concurring with opinion.

Because the procedure followed by the State in this case indicates there was time to request a warrant, I am compelled to concur with the majority opinion. However, I write separately to stress that were the facts even slightly different, I would affirm the trial court's partial denial of the Weises' motion to suppress.

The evidence at issue in this appeal is what the caseworker and police officer saw after the front door of the Weises' home swung open. The uncontested evidence is that no one turned the knob, but the door swung open as Sulawske knocked repeatedly. Sulawske then stepped a foot or two inside the door to yell for any occupant who might be home. From that vantage point, she could see that the house was filthy and in disarray. When Officer Leister heard Michael Weis coming down the stairs, he stepped into the house to keep the peace and saw the house was a mess.

As a general matter, the Fourth Amendment prohibits the State [4] from entering a private home without a warrant.[5] However, there are exceptions to the warrant requirement. One is "when the facts suggest a reasonable belief that a person within the premises is in need of aid." *Stewart v. State*, 688 N.E.2d 1254, 1257 (Ind.1997) (quoting *Geimer v. State*, 591 N.E.2d 1016, 1019 (Ind.1992)).

---

4. As the Weises argue, "[w]hile not expressly given law enforcement status, the level of cooperation between the Department of Public Welfare in a CHINS proceeding and the police and prosecutor's office in a related criminal proceeding is such that any effort to deny a caseworker's status as an agent of the state in these cases would be ludicrous."

*Hastings v. State*, 560 N.E.2d 664, 668 (Ind. Ct.App.1990), *trans. denied.*

5. Because the parties make no separate argument under the Indiana Constitution, we address only the validity of this search under the federal constitution. *See Stewart v. State*, 688 N.E.2d 1254, 1256 (Ind.1997).

Hertel testified the television and the lights in the living room were on when she arrived alone at the Weises' house that morning, but no one answered the front door despite her repeated knocking and yelling. Had Hertel called 911 and had an officer immediately sent to the house to assist her in checking to ensure the occupants of the home were safe, the State's argument that it acted to ensure the safety of the Weises would be more compelling. *See, e.g., Stewart,* 688 N.E.2d at 1257 (holding police properly entered hotel room without a warrant to aid occupants when maid knew defendant was in room but knocking and repeated calls to the room went unanswered). However, Hertel did not call for immediate police assistance; rather, she met Sulawske and Officer Leister at city hall before returning to the Weises' home. As the majority notes, "[i]t is patently obvious that the timing was such as to allow for presentation of the facts to an independent magistrate in order to request a warrant." *Op.* at 215.

In addition, I note that these circumstances come very close to not being a "search" under the Fourth Amendment. The State is permitted to seize evidence under the plain view doctrine [6] if the initial entry is permissible under the Fourth Amendment and if the incriminating nature of the evidence is immediately apparent. *Id.* Under the first part of the analysis, the Fourth Amendment permits the State, when conducting an investigation, to enter a citizen's land, approach the front door, and knock on that door without requesting a search warrant, because when engaging in those acts, police do "not stray from places that visitors to the property could be expected to go when they park[ ] in [a] driveway and approach[ ][a] residence." *VanWinkle v. State,* 764 N.E.2d 258, 264 (Ind.Ct.App.2002), *trans. denied* 774 N.E.2d 516 (Ind.2002). *See also Sayre v. State,* 471 N.E.2d 708, 712 (Ind.Ct.App. 1984) ("when a police officer sees contraband from an area that is not constitutionally protected, i.e., *before* an intrusion, .... no search in the constitutional sense has occurred") (emphasis original), *reh'g denied, trans. denied* (Ind.1985), *cert. denied* 475 U.S. 1027, 106 S.Ct. 1226, 89 L.Ed.2d 336 (1986).

Sulawske, Officer Leister, and Hertel were not violating the Fourth Amendment or conducting a search when they approached and knocked on the Weises' door. *See Sayre,* 471 N.E.2d at 712. Anything they saw while approaching the door or standing at the door would have been admissible. Because the uncontested evidence indicated the front door opened after repeated knocking, *without anyone turning the handle,* I would have held no search occurred had the State seen incriminating evidence when the door initially swung open to whatever extent caused by the knocking.[7] However, Officer Leister and Sulawske both indicated Sulawske pushed the door open wider and they stepped into the Weises' residence *before* they saw the incriminating evidence. Because they crossed the threshold of the Weises' home without permission, they were no longer where "visitors to the property could be expected to go." *VanWinkle,* 764 N.E.2d at 264. Accordingly, a search occurred.[8]

---

6. On other occasions, this doctrine has been referred to as the "open view doctrine." *See Sayre v. State,* 471 N.E.2d 708, 712 (Ind.Ct. App.1984).

7. Sulawske testified the door opened an inch or two, while Officer Leister testified the door opened about a foot.

8. The State appropriately so conceded.

I therefore reluctantly concur in the majority opinion.