**Jason TRAYLOR, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 63A04–0309–CR–466.**

Court of Appeals of Indiana.

Nov. 10, 2004.

⚷262

Katherine C. Liell, Stacy R. Uliana, Liell & McNeil, Bloomington, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

Jason Traylor was found guilty by a jury and convicted of dealing (manufacturing)

in methamphetamine over three grams, a Class A felony, possession of methamphetamine over three grams, a Class C felony, and visiting a common nuisance, a Class B misdemeanor. The trial court sentenced him to forty years for the Class A felony conviction, six years for the Class C felony conviction, and 180 days for the Class B misdemeanor, sentences to be served concurrently. Traylor appeals his convictions and sentences. We affirm in part and remand.

## Issues

Traylor raises six issues for our review, which we expand and restate as the following:

1. Whether the trial court properly admitted evidence of the items found on the Erlingers' property;

2. Whether Traylor was denied his right to present a defense;

3. Whether the State presented sufficient evidence to support Traylor's convictions;

4. Whether the trial court properly sentenced Traylor;

5. Whether the trial court properly imposed a drug fee against Traylor;

6. Whether the trial court properly applied Traylor's bond to satisfy his fines, costs, and fees imposed; and

7. Whether the trial court properly revoked Traylor's bond.

## Facts and Procedural History

In the early morning of March 2, 2003, Pike County Sheriff's Deputy Brad Jenkins received an anonymous tip concerning a strong odor of ether near "Camp's

curve" in Velpen, Indiana. Deputy Jenkins drove to the area and noticed a strong odor of ether and a slight odor of anhydrous ammonia coming from the direction of a mobile home owned by Paul and Ginnie Erlinger. Based on his training and experience, Deputy Jenkins knew that ether and anhydrous ammonia are two chemicals commonly used in the manufacturing of methamphetamine.

Deputy Jenkins called for assistance. Indiana State Police Troopers Bill Gadberry, Tim Weisenberger, and Matt Haywood, along with Petersburg Police Department Sergeant Chad McClellan, responded to Deputy Jenkins's call for assistance. Once they arrived, Deputy Jenkins and Trooper Gadberry approached the front door of the Erlingers' residence, and the other officers proceeded to the back door of the residence. As they were doing so, Ginnie Erlinger came to the front door and asked who was there. As Trooper Gadberry identified himself, one of the officers at the back door of the residence advised Deputy Jenkins that he saw an HCl generator[1] sitting on a gas grill by the back door.

Deputy Jenkins proceeded to the back door of the mobile home and saw the HCl generator. He also detected an odor of anhydrous ammonia coming from an outbuilding behind the mobile home. The officers arrested everyone present at the residence that evening, which included Traylor, Ginnie and Paul Erlinger, and Crystal Freeman. The officers subsequently obtained a search warrant for the Erlingers' property.

The State charged Traylor with dealing (manufacturing) in methamphetamine over

---

1. Hydrogen chloride (HCl) gas is a common component used to manufacture methamphetamine. One can purchase HCl gas, but usually methamphetamine manufacturers create HCl gas in homemade HCl generators by mixing acid and salt together in the generator to produce HCl gas. Deputy Jenkins testified that the HCl generator found in this case consisted of a two-liter plastic pop bottle with a plastic tube coming out of a hole in the bottle cap. Tr. at 362–64.

three grams, possession of methamphetamine over three grams, possession of anhydrous ammonia with intent to manufacture methamphetamine, possession of two or more chemical agents or precursors with the intent to manufacture methamphetamine, illegal storage of anhydrous ammonia, and visiting a common nuisance. Traylor moved to suppress all evidence against him, alleging that the search was unconstitutional under both the Federal and Indiana Constitutions. After a hearing, the trial court denied Traylor's motion.

Traylor was subsequently found guilty by a jury and convicted of dealing (manufacturing) in methamphetamine over three grams as a Class A felony, possession of methamphetamine over three grams as a Class C felony, and visiting a common nuisance as a Class B misdemeanor. The trial court sentenced him to forty years for the Class A felony conviction, six years for the Class C felony conviction, and 180 days for the Class B misdemeanor conviction, all sentences to be served concurrently. Additionally, the trial court imposed a $10,000 fine and required Traylor to pay a $1,000 drug fee. This appeal ensued. Additional facts will be provided as necessary.

*Discussion and Decision*

### I.   Admission of Evidence

■ Traylor initially contends the trial court erred in admitting all evidence against him because the officers' warrantless entry into the Erlingers' backyard and residence violated both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution. We disagree.

### A.   Standard of Review

■ The admission or exclusion of evidence is a matter within the trial court's discretion, and we will reverse only upon an abuse of that discretion. *Greenboam v. State,* 766 N.E.2d 1247, 1250 (Ind.Ct.App. 2002), *trans. denied.* An abuse of that discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Joyner v. State,* 678 N.E.2d 386, 390 (Ind. 1997).

### B.   Warrantless Entry

■ In analyzing this issue under the Fourth Amendment, we look to whether a person has a constitutionally-protected reasonable expectation of privacy. *Bennett v. State,* 787 N.E.2d 938, 944 (Ind.Ct. App.2003), *trans. denied* (quoting *Shultz v. State,* 742 N.E.2d 961, 964 (Ind.Ct.App. 2001), *trans. denied* ). When police officers come onto private property to conduct an investigation or for some other legitimate purpose, and they restrict their movements to places visitors could be expected to go, such as walkways, driveways, or porches, observations made from such vantage points are not protected under the Fourth Amendment. *Id.*

■ Despite the fact that the text of Article I, Section 11 is nearly identical to the Fourth Amendment, Indiana courts interpret and apply it independently from Fourth Amendment jurisprudence. *Winebrenner v. State,* 790 N.E.2d 1037, 1041 (Ind.Ct.App.2003). In deciding whether a warrantless search and seizure violates Article I, Section 11, we must determine whether, under the totality of the circumstances, the warrantless search was reasonable. *Scott v. State,* 775 N.E.2d 1207, 1211 (Ind.Ct.App.2002), *trans. denied.*

In *VanWinkle v. State,* 764 N.E.2d 258 (Ind.Ct.App.2002), *trans. denied,* an officer received three phone calls reporting a strong odor of ether emanating from a resident's mobile home. On the day of the third call, another officer investigated the report by driving by the resident's mobile

home. At that time, the officer noticed a strong odor of ether emanating from the mobile home. The officer suspected the resident was manufacturing methamphetamine inside the mobile home and contacted other officers to assist him in his investigation. Concerned about safety (due to the volatile chemicals used in the manufacturing of methamphetamine) and the potential destruction of evidence (since methamphetamine labs can be moved relatively quickly), officers decided to perform a "knock and talk" procedure. Two officers approached the front door of the mobile home and three officers went to the rear door of the residence. The rear door consisted of a rough, wood-framed windbreak and entry area that was built onto the mobile home. *Id.* at 260–61.

On the front porch, officers observed a propane tank with an altered valve, which they believed contained anhydrous ammonia. They knocked on the front door and identified themselves. At that time, the resident attempted to run out the rear door of the trailer, but he was stopped and handcuffed by the officers at the rear door. While handcuffing the resident, an officer observed through the open rear door a jar with a liquid substance in it. After determining that other individuals were in the residence, officers entered to conduct a protective sweep. They eventually obtained a search warrant and searched the mobile home. *Id.* at 261–63.

The resident moved to suppress all evidence against him, alleging that the entry onto his property violated the Fourth Amendment and Indiana Constitution Article I, Section 11. We disagreed and upheld the officers' entry onto his property under both the Fourth Amendment and

Article I, Section 11 because the officers were there for a legitimate reason: to conduct an investigation. *Id.* at 264. Additionally, the officers, in approaching the residence's front and rear doors, stayed in places where visitors to the mobile home would be expected to go. *Id.*

The facts in the case at hand are identical to the facts in *VanWinkle*. Deputy Jenkins received from dispatch a report by an anonymous caller of a strong odor of ether in the vicinity of the Erlingers' mobile home. After driving by the area and noticing not only a strong odor of ether but also a slight odor of anhydrous ammonia, Deputy Jenkins called for assistance and waited for other officers to arrive. Deputy Jenkins and the other officers decided to perform a "knock and talk" procedure due to their concern for others' safety and for the potential destruction of evidence. The officers approached both the front and rear doors of the residence. While at the rear door, officers observed in open view the HCl generator. At that point, the officers arrested everyone at the Erlingers' residence and obtained a search warrant.

Similar to the officers in *VanWinkle*, the officers in this case entered onto the Erlingers' property for a legitimate reason: to conduct an investigation of the odor of ether and anhydrous ammonia emanating from their residence. In approaching the mobile home's front and rear doors, the officers stayed in places where visitors would be expected to go. Therefore, the officers' entry onto the Erlingers' property and subsequent search and seizure of items found on the property did not violate either the Fourth Amendment or Article I, Section 11.[2]

---

**2.** Because we hold the officers' entry onto the Erlingers' property and observation of the HCl generator at the rear of the residence did not violate either the Fourth Amendment or

Article I, Section 11, we need not address whether Traylor had standing to challenge the entry onto the Erlingers' property.

## II.  Right to Present Defense

■ At trial, the State called Ginnie Erlinger as a witness to testify about her husband, Paul, and Traylor's methamphetamine manufacturing partnership. During cross-examination, the following colloquy occurred:

[DEFENSE COUNSEL]: And, as [the State] brought out, you had charges brought against you in this matter, is that correct?

[GINNIE]: Yes.

[DEFENSE COUNSEL]: And they were the same charges as brought against Mr. Traylor, is that correct?

[GINNIE]: Yes.

[DEFENSE COUNSEL]: Except, I believe, you were charged, one difference was you were charged with maintaining a common nuisance?

[GINNIE]: Correct.

[DEFENSE COUNSEL]: Instead of visiting, is that correct?

[GINNIE]: Yes.

* * *

[DEFENSE COUNSEL]: And uh, what's happened to the Class "A" felony charge against you?

[GINNIE]: I think it was dropped, like at my first hearing that I had.

[DEFENSE COUNSEL]: Okay. State dropped that one?

[GINNIE]: Right.

[DEFENSE COUNSEL]: Did you receive any promises at all from the State for your testimony in this case?

[GINNIE]: No I didn't.

[DEFENSE COUNSEL]: Did you, did you or your husband, did your husband in your presence, receive any offers from the State to testify?

[STATE]: Your Honor, I'm going to object. I mean he can get into that with Mr. Erlinger.

[TRIAL COURT]: Sustained. Sustained.

[DEFENSE COUNSEL]: Well you're related to Mr., your, your Mr. Erlinger's husband, wife, is that correct?

[GINNIE]: Yes.

[DEFENSE COUNSEL]: Okay. You're concerned about his situation, correct?

[GINNIE]: Correct.

[DEFENSE COUNSEL]: Uh, it's your testimony you made no, no deals with the prosecution?

[GINNIE]: No I didn't.

[DEFENSE COUNSEL]: For your testimony, nothing?

[GINNIE]: Nothing.

[DEFENSE COUNSEL]: Never talked about it?

[GINNIE]: Never talked about it.

[DEFENSE COUNSEL]: You're just doing this on your own?

[GINNIE]: I, they didn't take away my Class "A" felony for me to sit up here.

* * *

[DEFENSE COUNSEL]: Alright. (Pause). In your presence, do you know of anyone who was offered a deal to testify in order to take Mr. Traylor down, in your presence?

[STATE]: Your Honor, I object. Again I . . .

[TRIAL COURT]: Sustained. It's hearsay.

[DEFENSE COUNSEL]: Were, did you attend a, a uh, interrogation at the Indiana State Police Post, with, you and your husband?

[STATE]: Your Honor, if [defense counsel] wants to go here, I'm going to insist we play [the videotaped statements of the interrogation]. I just . . .

[DEFENSE COUNSEL]: Well, that's
. . .

[STATE]: . . . want to make sure he understands that.

[DEFENSE COUNSEL]: I understand that.

[STATE]: All of them.

[GINNIE]: I can answer it.

[TRIAL COURT]: You can answer the question. There's not been an objection.

[GINNIE]: Yes.

[DEFENSE COUNSEL]: Okay. And you personally went to one at the In, Indiana State Police Post at Jasper too, is that correct?

[GINNIE]: Yes.

Tr. at 441–46.

Subsequently, the court recessed for lunch. During the recess, the trial court discussed with the parties the potential admission of the videotaped statements made by Paul and Ginnie Erlinger. These videotapes had previously been the subject of a motion in limine because they were unfairly prejudicial to Traylor's case. The State argued to the trial court that the tapes should be played for the jury because Traylor opened the door to their admission during his cross-examination of Ginnie. Traylor countered that he did not believe he opened the door to their admission, but even if he did, the tapes were unfairly prejudicial and should be excluded under Indiana Rule of Evidence 403. Ultimately, the trial court decided not to admit the videotapes due to their prejudicial nature but ruled that the State could ask Ginnie what statements she made to the police during the interview.

Traylor now contends the trial court denied him his right to present a defense when it refused to allow him to expose Ginnie's alleged bias. More specifically, Traylor argues that because he was "threatened" with admission of the videotaped statements made by Paul and Ginnie Erlinger, the trial court limited his cross-examination because he was unable to ask Ginnie whether she had an implicit deal with the State that she would be treated favorably by the State in exchange for her testimony against Traylor. We disagree.

The trial court did not limit Traylor's questioning, but instead advised Traylor that his questioning could open the door to the admission of the videotapes. Traylor chose not to continue his questioning for fear that the videotapes would be played for the jury. Thus, the trial court did not limit Traylor's questioning; instead, Traylor made a strategic decision not to inquire further about Ginnie's alleged bias for fear that he might open the door to admission of the videotapes. For this reason, Traylor was not denied his right to present a defense.

### III. Sufficiency of the Evidence

Traylor argues that the evidence presented at trial was insufficient to sustain his convictions for dealing (manufacturing) in methamphetamine and for visiting a common nuisance. We disagree.

#### A. Standard of Review

■ In reviewing sufficiency of the evidence claims, we do not reweigh the evidence or assess the credibility of witnesses. *Williams v. State*, 798 N.E.2d 457, 459 (Ind.Ct.App.2003). Instead, we review the evidence and reasonable inferences supporting the conviction to determine whether substantial evidence of probative value exists to support the judgment. *Id.*

#### B. Dealing (Manufacturing) in Methamphetamine

■ During the execution of a search warrant at the Erlingers' residence, the police found a large glass jar, or reaction

vessel, that was used to convert ephedrine into methamphetamine base. At the time of the search, ephedrine was reacting with the other chemicals in the vessel to form methamphetamine base, but the process had not yet been completed. The State's forensic scientist found that the product in the reaction vessel weighed 23.72 grams. Traylor argues that the State presented insufficient evidence to show that he manufactured over three grams of methamphetamine because the State only presented evidence of the weight of the entire product found in the vessel, not the weight of the actual methamphetamine that was manufactured. Thus, he argues that, at best, the State presented sufficient evidence to convict him only of *attempt* to manufacture methamphetamine, a crime for which he was not charged.[3]

Indiana Code section 35–48–4–1 provides that a person is guilty of dealing in a narcotic drug as a Class A felony if he knowingly or intentionally manufactures at least three grams of methamphetamine. Indiana Code section 35–48–1–18(1) defines "manufacture" as

> the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis. . . .

In *Bush v. State*, 772 N.E.2d 1020 (Ind. Ct.App.2002), *trans. denied*, the police executed a search warrant at the defendant's residence and found many items used in the manufacture of methamphetamine, including a can of denatured alcohol, a coffee grinder with white residue in it, empty iodine and hydrogen peroxide containers, bottles of mini-thins that contained pseudoephedrine, and a turkey baster. Additionally, the police found two jars of liquid, both of which contained ephedrine and pseudoephedrine. An expert for the State testified that the lab was an "in process lab," meaning the process of making methamphetamine had begun, but it had not yet been completed. The police did not find any methamphetamine in its final form. *Id.* at 1022.

Nevertheless, we held the State presented sufficient evidence that the defendant was manufacturing methamphetamine because the defendant was producing, preparing, and processing methamphetamine, all of which were encompassed by in the statutory definition of "manufacture." *Id.* at 1023. Furthermore, we held Indiana Code section 35–48–1–18(1) does not require that the process be completed or that there actually be a final product before the statute applies. *Id.*

> We refer to a plant that makes widgets as a widget manufacturing plant because it is engaged in the process of making them. A person visiting a plant that contains the necessary parts and instructions for making widgets could reasonably conclude that he is visiting a plant that "manufactures" widgets, even if he never actually sees a completed widget. Likewise, a reasonable juror in this case could certainly conclude that [the defendant] manufactured methamphetamine based upon the circumstantial evidence of its production. In fact, there was no other reasonable explanation for the evidence found at the house

---

3. We note that the items used in the manufacture of methamphetamine were all found on the Erlingers' property. Traylor does not raise the issue of whether he constructively possessed the items that were used against him to show he manufactured methamphetamine. Therefore, we need not address it.

other than that he was in the process of making methamphetamine.

*Id.*

Likewise, the State presented sufficient evidence in this case that Traylor was involved in the manufacture of methamphetamine. During the execution of the search warrant at the Erlingers' residence, the police found the following items commonly used in the manufacture of methamphetamine: camp fuel, anhydrous ammonia, an HCl generator, sulfuric acid, salt, ether, electronic scales, and pseudoephedrine. Indiana State Police Sergeant James Dotson testified at trial that the reaction vessel that was found during the search was a "batch of meth cooking right there." Tr. at 586. Thus, the process of making methamphetamine had begun, but it had not yet been completed.

Furthermore, Sergeant Dotson testified that once the methamphetamine is finished "cooking" in the reaction vessel, the product left in the vessel is then converted into its final form: crystallized methamphetamine. Because the State showed that Traylor was producing, preparing, and processing methamphetamine, and the product in the reaction vessel weighed well over three grams, the State presented sufficient evidence that Traylor was involved in the manufacture of at least three grams of methamphetamine.

### C. Visiting a Common Nuisance

Indiana Code section 35–48–4–13(a) states that "[a] person who knowingly or intentionally visits a building, structure, vehicle, or other place that is used by any person to unlawfully use a controlled substance commits visiting a common nuisance, a Class B misdemeanor." To convict a defendant of visiting a common nuisance, the State must prove that the defendant knew the building, structure, vehicle, or other place that he visited was used for the unlawful use of a con-

trolled substance. *Hale v. State,* 785 N.E.2d 641, 643 (Ind.Ct.App.2003) (quoting *Bass v. State,* 512 N.E.2d 460, 463 (Ind.Ct.App.1987), *reh'g granted in part,* 517 N.E.2d 1238 (1988), *trans. denied* ). Additionally, the State must prove that the building, structure, vehicle or place the defendant visited was used multiple times for the unlawful use of a controlled substance. *Id.* The term "common nuisance" "necessarily requires proof of a continuous or recurrent violation." *Id.*

Traylor contends the State failed to prove that the Erlingers' residence was a "common nuisance." More specifically, Traylor argues that the State failed to show that the Erlingers' residence was used multiple times for the unlawful use of methamphetamine. However, during the execution of the search warrant, police found a briefcase in the garage, which contained a baggie of methamphetamine and a glass pipe used for the consumption of methamphetamine. Additionally, police found glass pipes, some with burnt residue, in other parts of the residence. Thus, it was reasonable for the jury to infer from the evidence the State presented that the Erlingers' residence was used more than once for the consumption of methamphetamine. *See Frye v. State,* 757 N.E.2d 684, 691 (Ind.Ct.App.2001), *trans. denied, cert. denied,* 535 U.S. 1103, 122 S.Ct. 2308, 152 L.Ed.2d 1063 (2002) (holding evidence sufficient to support finding that house was a common nuisance where police found large quantity of drugs and drug paraphernalia lying around house, which suggested house was being used to unlawfully consume controlled substances).

### IV. Proper Sentences

Traylor contends his sentences were improper for the following reasons: (1) the trial court relied on improper aggravating circumstances in imposing enhanced sentences; (2) Traylor's enhanced sentences

and fine of $10,000 were inappropriate in light of his character and the nature of his offense; and (3) the recent United States Supreme Court case, *Blakely v. Washington*, — U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), controls the outcome of this case. Because we find Traylor's third contention to be dispositive, we need not address the first two contentions.

### A. *Apprendi/Blakely* Caselaw

■ In 2000, the United States Supreme Court decided *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In *Apprendi*, the defendant, a Caucasian, shot several bullets into the home of an African–American family who had just moved into an all-white neighborhood in New Jersey. After being arrested, the defendant admitted that he had shot at the family's home because they were African–American. *Id.* at 469, 120 S.Ct. 2348. After pleading guilty to, *inter alia*, second-degree possession of a firearm for an unlawful purpose, the trial court enhanced the defendant's sentence when it found by a preponderance of the evidence that the defendant's crime was motivated by racial bias. *Id.* at 470–71, 120 S.Ct. 2348. In reversing the trial court's enhancement of the defendant's sentence, the Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348.

Recently, the United States Supreme Court decided *Blakely* to clarify what constitutes the "prescribed statutory maximum" sentence. In *Blakely*, the defendant was initially charged with first-degree kidnapping. Pursuant to a plea agreement, the defendant pled guilty to second-degree kidnapping involving domestic violence and use of a firearm. Under Washington's sentencing statutes, the offense of second-degree kidnapping with a firearm carried a standard range of forty-nine to fifty-three months. *Blakely*, — U.S. at ——–——, 124 S.Ct. at 2534–35. However, the trial court could enhance a sentence above the standard range if it found certain aggravating factors, including that the defendant had acted with "deliberate cruelty." Finding that the defendant acted with deliberate cruelty, the trial court sentenced the defendant to ninety months. *Id.* at 2535.

The Supreme Court, in invalidating the defendant's sentence because it did not comply with the Sixth Amendment's right to a trial by jury, held the prescribed

"statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings.

*Id.* at 2537 (emphasis in original).

### B. Applicability of *Apprendi/Blakely*

Traylor was convicted of dealing (manufacturing) in methamphetamine over three grams, a Class A felony, and possession of methamphetamine over three grams, a Class C felony. Indiana Code section 35–50–2–4 states, "A person who commits a Class A felony shall be imprisoned for a fixed term of thirty (30) years, with not more than twenty (20) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances. . . ." Indiana Code section 35–50–2–6 provides, "A person who commits a Class C felony shall be imprisoned for a fixed term of four (4) years, with not more than four (4) years added

for aggravating circumstances or not more than two (2) years subtracted for mitigating circumstances."

As stated above, the prescribed statutory maximum for *Apprendi* purposes was defined as the following:

> the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings.

*Blakely,* —— U.S. at ——, 124 S.Ct. at 2537 (emphasis in original). Under Indiana law, after a jury returns a guilty verdict, the trial court can only impose the presumptive sentence, as outlined in the statute, without finding any additional facts. Therefore, the presumptive sentence for an offense is the prescribed statutory maximum for *Apprendi/Blakely* purposes. For Traylor's Class A felony conviction, the presumptive sentence was thirty years. *See* Ind.Code § 35–50–2–4. For his Class C felony conviction, the presumptive sentence was four years. *See* Ind.Code § 35–50–2–6.

Traylor was sentenced to an enhanced term of forty years for the Class A felony conviction and an enhanced term of six years for the Class C felony conviction. In enhancing Traylor's sentences, the trial court found the following aggravating circumstances: (1) there is a great risk that Traylor will commit another crime; (2) the particularized nature and circumstances of the crime committed; (3) Traylor's prior criminal history; (4) Traylor's character; and (5) Traylor is in need of correctional and rehabilitative treatment that can best be provided by commitment to a penal facility.

Under *Apprendi,* "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added). Because the aggravating circumstances upon which the trial court enhanced Traylor's sentences were not submitted to a jury and proved beyond a reasonable doubt, under *Apprendi,* only Traylor's prior criminal convictions could be used by the trial court to enhance Traylor's sentences in this case.

Traylor contends, however, that it was improper for the trial court to enhance his sentences based on his prior criminal history. We agree. Traylor's prior criminal history consists of one misdemeanor conviction in 1998 for battery. The trial court noted that it found "this to be an aggravating factor of minimal weight." Appellant's Appendix at 494. A misdemeanor battery conviction nearly five years before the instant offenses, standing alone, is insufficient to enhance Traylor's sentences. *See, e.g., Newsome v. State,* 797 N.E.2d 293, 300 (Ind.Ct.App.2003), *trans. denied* (stating that a criminal history that consisted of three fairly recent misdemeanor convictions, two of which were for battery, would not be sufficient, standing alone, to enhance a defendant's sentence); *Westmoreland v. State,* 787 N.E.2d 1005, 1010 (Ind.Ct.App.2003) (concluding that "a criminal history comprised of misdemeanors that are unrelated to the present offense are not significant aggravators in the context of a sentencing hearing for criminal deviate conduct."); *Watson v. State,* 784 N.E.2d 515, 523 (Ind.Ct.App.2003) (holding "a criminal history comprised of two, nonviolent misdemeanors that are unrelated to the present offense are not significant aggravators in the context of a sentencing hearing for battery."). Therefore, we va-

cate Traylor's sentences for his Class A felony conviction and his Class C felony conviction, and we remand this cause to the trial court for further proceedings consistent with this opinion.[4]

## V. Drug Fee

■ Traylor contends, and the State concedes, that the trial court erred in failing to assess Traylor's ability to pay the $1,000 drug fee imposed upon him. Indiana Code section 33–19–6–9 states in pertinent part:

(a) This section applies to criminal actions.

(b) The court shall assess a drug abuse, prosecution, interdiction, and correction fee of at least two hundred dollars ($200) and not more than one thousand dollars ($1,000) against a person convicted of an offense under [Indiana Code article] 35–48–4.

(c) In determining the amount of the drug abuse, prosecution, interdiction, and correction fee assessed against a person under subsection (b), *a court shall consider the person's ability to pay the fee.*

(Emphasis added). In the case at hand, the trial court ordered Traylor to pay a $1,000 drug fee without first determining Traylor's ability to pay the fee. Thus, we remand this cause to the trial court to determine Traylor's ability to pay the fee.

## VI. Bond

■ On March 5, 2003, an initial hearing was held in the case at hand and the trial court set bond in the amount of $50,000. The trial court allowed Traylor to post a ten percent deposit, which he did the next day. On March 7, 2003, the State requested that Traylor's bond be revoked because Traylor was arrested for committing criminal confinement and battery against his ex-girlfriend, Becky Schepers, while out on bond. The trial court granted the State's motion and issued an arrest warrant for Traylor, setting the bond at $30,000.

On March 13, 2003, Traylor posted bond in the amount of $25,000, which was added to the $5,000 deposit on his original bond. After the trial court convicted Traylor in this cause, it withheld Traylor's $30,000 bond to satisfy his fines, costs, and fees imposed by the trial court, with the remainder being held for the criminal charges that were still pending. Traylor contends the trial court erred in withholding his cash bond. We agree.

Indiana Code section 35–33–8–3.2 provides in pertinent part as follows:

(a) A court may admit a defendant to bail and impose any of the following conditions to assure the defendant's appearance at any stage of the legal proceedings, or, upon a showing of clear and convincing evidence that the defendant poses a risk of physical danger to

---

4. We note that in *Carson v. State*, 813 N.E.2d 1187 (Ind.Ct.App.2004), a panel of this court held a trial court did not err, under *Apprendi/Blakely*, in enhancing a defendant's sentence, based on the following aggravating circumstances: prior criminal history; a need for corrective or rehabilitative treatment best provided by commitment to a penal facility; and the strong likelihood that the defendant would commit another crime. *Id.* at 1189. After stating that prior criminal convictions are exempt from the requirement of jury find-

ings under *Apprendi,* the panel held the other two aggravating circumstances "are simply derivative of that extensive history of convictions and thus would seem also not to implicate the *Blakely* analysis." *Id.* at 1189. Because we hold Traylor's one misdemeanor criminal conviction five years ago is not a proper aggravator to enhance his sentence, any circumstances that may or may not derive from his prior criminal history also are not proper aggravators to enhance Traylor's sentences.

another person or the community, to assure the public's physical safety:

(1) Require the defendant to:

(A) execute a bail bond with sufficient solvent sureties;

(B) deposit cash or securities in an amount equal to the bail;

* * *

(2) Require the defendant to execute a bail bond by depositing cash or securities with the clerk of the court in an amount not less than ten percent (10%) of the bail. If the defendant is convicted, the court may retain all or a part of the cash or securities to pay fines, costs, fees, and restitution, if ordered by the court. A portion of the deposit, not to exceed ten percent (10%) of the monetary value of the deposit or fifty dollars ($50), whichever is the lesser amount, may be retained as an administrative fee. The clerk shall also retain from the deposit under this subdivision the following:

(A) Fines, costs, fees, and restitution as ordered by the court.

(B) Publicly paid costs of representation that shall be disposed of in accordance with subsection (b).

In *Goffinet v. State,* 775 N.E.2d 1227 (Ind.Ct.App.2002), *trans. denied,* we held the trial court abused its discretion in retaining a cash bond posted by the defendant's father, where the father posted the entire amount of bond in cash, because "Indiana Code Section 35–33–8–3.2 does not authorize the trial court to order any money retained from a bond remittance for any purpose unless the bond was a 10% cash or securities deposit governed by Indiana Code Section 35–33–8–3.2(a)(2)." *Id.* at 1233–34. Thus, both parties in this case agree that if the bond that the trial court withheld included only the ten percent deposit on Traylor's original bond of $50,000, under Indiana Code section 35–

33–8–3.2(2)(A), the trial court would be entitled to withhold Traylor's deposit to cover the fines, costs, and fees imposed by the trial court. However, if Traylor paid the entire amount of his bond in cash, he is entitled to a remittance of his cash bond.

Traylor contends he originally posted a ten percent deposit of his $50,000 bond on March 6, 2003. However, on March 7, 2003, Traylor contends the trial court revoked his bond and imposed a higher bond of $30,000. As a result, Traylor posted an additional $25,000 that, along with the original $5,000 he had deposited, covered his cash bond of $30,000. Traylor thus claims that because he posted cash equal to the amount of the bond, Indiana Code section 35–33–8–3.2(2)(A) is not applicable, and he is entitled to a return of his cash bond.

The State counters that the additional $25,000 that Traylor posted on March 7, 2003, was not for his increased bond for the instant offense, but instead represented the amount of bond posted on his new offenses of criminal confinement and battery on his ex-girlfriend. Therefore, the State argues that the trial court rightfully withheld the ten percent deposit Traylor posted on his original $50,000 bond because it fell under Indiana Code section 35–33–8–3.2(2)(A), and the trial court properly withheld the remaining $25,000 because it was the bond for charges that were still pending against Traylor at the time of his conviction and sentencing in the instant case.

We agree with Traylor. The Chronological Case Summary contains the following entry for March 7, 2003: "Comes now Boyd Toler, Prosecuting Attorney and *requests bond be revoked,* defendant committed battery while on bond, and an arrest warrant be issued. Court grants same and directs the Clerk of Pike Circuit Court

to issue an arrest warrant with bond to be set at $30,000 cash only." Appellant's Appendix at 3 (emphasis added). The arrest warrant the trial court issued had "Bond Revocation" written in the upper left-hand corner and stated that Traylor was to answer for the offenses brought against him in the instant case. The offenses of criminal confinement and battery were not mentioned on the arrest warrant. Most notably, however, the State noted in its motion for permanent bond revocation, filed on March 18, 2003, that "Mr. Traylor's initial bond was revoked, and bond was reset in amount [sic] of $30,000 cash." Appellant's Appendix at 44. For these reasons, we agree with Traylor that he posted the entire amount of bail in cash and is therefore entitled to a remittance of his $30,000 cash bond.

### VII. Bond Revocation

■■■■ Traylor finally contends his bond was improperly revoked without a hearing. Indiana Code section 35–33–8–5(a) provides in relevant part: "Upon a showing of good cause, the state or the defendant may be granted an alteration or revocation of bail by application to the court before which the proceeding is pending." When the State requests that bond be revoked, due process requires that the trial court hold a hearing on the request. *Vacendak v. State*, 261 Ind. 317, 302 N.E.2d 779, 780 (1973). However, our supreme court also stated,

> [W]e do not mean to imply that the trial judge cannot in the exercise of his sound discretion order the immediate arrest of a defendant upon information that would indicate he should not be permitted to remain at large on a posted bond. For instance, a court should never be in the position of being unable to prevent a defendant from leaving the jurisdiction while he was on bond awaiting trial. Our holding today is that a defendant is

entitled to a hearing on the increase of his bond. Due process has been served if this hearing occurs within a reasonable time after his arrest on order of the trial court.

*Id.* at 781.

On April 7, 2003, the State filed a motion for permanent revocation of Traylor's bond, alleging that Traylor made death threats against the deputy prosecutor and his family. Without a hearing, the trial court granted the State's motion and issued an arrest warrant for Traylor. The next day, Traylor filed an objection to the bond revocation because the trial court did not hold a hearing before making its decision. The trial court set an evidentiary hearing on the matter for April 10, 2003, but Traylor requested a continuance for more time to prepare. On April 30, 2003, the trial court affirmed its bond revocation but nevertheless released Traylor on his posted $30,000 cash bond.

The trial court did not err in revoking Traylor's bond without a hearing on April 7, 2003. Under *Vacendak*, the trial court was permitted to order the immediate arrest of Traylor, and due process required only that a hearing be held within a reasonable amount of time after the trial court ordered Traylor's arrest, not prior to the arrest order. Because the trial court set a hearing on the bond revocation just three days after it ordered Traylor's arrest, the hearing was held within a reasonable amount of time after the trial court ordered Traylor's arrest. Therefore, the trial court did not violate Traylor's due process rights in revoking his bond before holding a hearing on that matter.

### *Conclusion*

The trial court did not err in admitting evidence of items found at the Erlingers' property, and Traylor was not denied his right to present a defense. Furthermore, the State presented sufficient evidence to

sustain Traylor's convictions. The trial court did not err in revoking Traylor's bond prior to a hearing. However, because *Blakely* controls the outcome of this case, and because the trial court erred in failing to assess Traylor's ability to pay the $1,000 drug fee imposed and in withholding Traylor's cash bond, we remand this cause to the trial court for proceedings consistent with this opinion.

Affirmed in part and remanded.

SHARPNACK, J., and DARDEN, J., concur.