**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 30 2013, 5:45 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**R. PATRICK MAGRATH**
Alcorn Goering & Sage, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD C. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CHRISTOPHER PEELMAN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 39A01-1301-CR-27 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE JEFFERSON CIRCUIT COURT
The Honorable Ted R. Todd, Judge
Cause No. 39C01-1207-FA-930

**October 30, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Chief Judge**

## Case Summary and Issues

Christopher Peelman appeals his convictions, and corresponding sentence, for dealing in methamphetamine and conspiracy to commit dealing in methamphetamine, both of which are Class A felonies. Peelman raises four issues for our review: (1) whether the warrantless search of the VanKuren residence violated Peelman's rights under the Fourth Amendment to the United States Constitution or Article 1, Section 11 of the Indiana Constitution; (2) whether there was sufficient evidence to sustain Peelman's convictions; (3) whether the trial court abused its discretion when it sentenced Peelman and (4) whether Peelman's sentence was inappropriate.

Concluding that Peelman's rights under the Fourth Amendment and the Indiana Constitution were not violated; there was sufficient evidence to support his convictions; and Peelman's sentence was not improper, we affirm.

## Facts and Procedural History

On July 25, 2012, Officer Johnathan Simpson and Officer Jacob Schmidt of the Madison Police Department were reviewing the NPLEx database, which maintains a record of pseudoephedrine purchases for Jefferson County, Indiana.[1] The officers noticed that three pseudoephedrine purchases were made by persons with the last name Taulbee, and all of the purchases were made at different pharmacies within only forty-five minutes of one another. Believing that this set of purchases was suspicious and potentially linked to methamphetamine, the officers went to the Taulbee residence to investigate.

---

[1] Pseudoephedrine is a key ingredient in the illegal manufacturing of methamphetamine. In an attempt to curb the manufacture of methamphetamine, Indiana law sets limits on the amount of pseudoephedrine that an individual may purchase in a given day, month, or year. See Ind. Code § 35-48-4-14.7(e).

The officers spoke with Joyce Taulbee, who admitted that she, her husband, and her son had each agreed to purchase pseudoephedrine for Darci McFadden in exchange for money. Joyce told the officers that McFadden was getting the pseudoephedrine for a man named "Chris" and that McFadden was taking the pseudoephedrine to Scott VanKuren's residence.

The officers drove to the VanKuren residence and parked in the driveway. As the officers approached the front door, they observed through the front window silhouettes of people moving inside. The officers opened the screen door to knock and were overcome by a strong chemical odor, which Officer Simpson recognized as being associated with the manufacturing of methamphetamine. According to Officer Simpson, the odor was so pungent that it made his eyes water, and both officers had to take a couple steps back from the door. Then, the officers knocked and announced themselves as police officers. The officers continued to see silhouettes moving around inside. After the officers knocked several times and received no response, they became concerned that the persons in the house might be destroying evidence and that the presence of a potential methamphetamine lab inside may present a danger. The officers then kicked the front door open, entered, and announced themselves as police.

The officers found McFadden, VanKuren, and Gerald Ritch standing in the hallway between the living room and the back of the house. The officers detained McFadden, VanKuren, and Ritch and took them outside. The officers asked if anyone else was inside, and the suspects said "no." However, the officers heard a commotion from the house, re-entered, and ordered whoever was inside to come out. Moments later, Peelman emerged from the back bedroom, and the officers detained Peelman.

The officers conducted a protective sweep of the residence, during which they seized several items linked to the manufacturing of methamphetamine, including camping fuel, fuel additive, and white pills found in the toilet and sink which were later determined to be pseudoephedrine. Next, the officers obtained a search warrant and conducted a more thorough search of the residence. Additional evidence found at the residence included cut-up lithium batteries; three containers of drain opener; plastic containers of ammonium nitrate; hypodermic needles; a plastic container holding a white residue, which was determined to be methamphetamine; and receipts for some of the items seized. The police also recovered cell phones, which revealed text messages between Peelman, VanKuren, and McFadden concerning the acquisition of pseudoephedrine and plans to go shopping for camping fuel and lithium batteries. The discovered receipts led the police to Walmart security tapes, which showed Peelman arriving at the store with VanKuren and showed Ritch, McFadden, VanKuren, and Peelman all purchasing items within twenty minutes of one another.

The State charged Peelman with Count I, dealing in methamphetamine, a Class A felony; Count II, conspiracy to commit dealing in methamphetamine, a Class A felony; and Count III, possession of methamphetamine, a Class B felony. Peelman filed a motion to suppress, which was denied after an evidentiary hearing on the issue. A jury found Peelman guilty of Counts I and II but was unable to reach a verdict as to Count III. Peelman was sentenced to thirty-eight years on Count I and thirty-eight years on Count II, to be served concurrently for an aggregate sentence of thirty-eight years imprisonment. Additional facts will be provided as necessary.

## I. Search and Seizure

First, Peelman argues that the warrantless entry of VanKuren's residence violated his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution, both of which ensure the right to be free from unreasonable searches and seizures. The State counters that Peelman, as a guest in VanKuren's home, had no reasonable expectation of privacy in the residence and cannot challenge the search under either the Fourth Amendment or the Indiana Constitution. And even if Peelman can challenge the search, the State argues that exigent circumstances justified the officers' warrantless entry.

As an initial matter, the State argues that Peelman does not have standing to challenge the search of VanKuren's residence. However, this argument was not raised before the trial court, and the State argues it now for the first time on appeal. Our supreme court has previously stated that it would be fundamentally unfair for the State to argue a defendant lacks standing to challenge a search after he was never prompted to make a record on that point at trial. Everroad v. State, 590 N.E.2d 567, 569 (Ind. 1992). Thus, when a defendant challenges the constitutionality of a search, the State may not argue lack of standing for the first time on appeal. Id.; see also Edwards v. State, 832 N.E.2d 1072, 1074-75 (Ind. Ct. App. 2005).

### A. Standard of Review

Our standard of review for denial of a motion to suppress is similar to other evidentiary issues. We consider evidence from both the trial and the suppression hearing, so long as evidence from the suppression hearing does not directly contradict trial

5

evidence. Montgomery v. State, 904 N.E.2d 374, 377 (Ind. Ct. App. 2009), trans. denied. We will not reweigh the evidence but will consider the evidence most favorably to the trial court's ruling. Id. Legal issues—such as determinations of reasonable suspicion and probable cause—are reviewed de novo. Myers v. State, 839 N.E.2d 1146, 1150 (Ind. 2005).

B. Fourth Amendment to the United States Constitution

Peelman contends that the warrantless entry of VanKuren's residence violated his rights under the Fourth Amendment. The outcome of this case turns on whether exigent circumstances were present to justify the officers' entry.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It is a basic principle of Fourth Amendment law that "searches and seizures inside a home without a warrant are presumptively unreasonable." Kentucky v. King, 131 S.Ct. 1849, 1856 (2011) (citation omitted). However, the Court has said that this presumption may be overcome because the "ultimate touchstone of the Fourth Amendment is reasonableness. Accordingly, the warrant requirement is subject to certain reasonable exceptions." Id. (citations and quotation marks omitted). Among these recognized exceptions is the existence of exigent circumstances. Id.

The State argues that two exigencies were present in this case which justify the warrantless entry: the need to assist persons subject to a threat of injury and the need to prevent the imminent destruction of evidence, both of which are encompassed by the

6

exigent circumstances exception. See id. We find the first of these rationales to be sufficient in this case.

In State v. Crabb, this court held that a warrantless entry into the defendant's residence was justified by exigent circumstances where the police could smell ether, an odor which they associated with the manufacturing of methamphetamine, coming from the house, and the police had reason to believe that a small child was inside the house. 835 N.E.2d 1068, 1069 (Ind. Ct. App. 2005), trans. denied. The court reasoned that the police officers could reasonably believe that a person inside the residence was in immediate need of aid, due to the dangers presented by the manufacturing of methamphetamine. Id. at 1071. Those dangers included the risk of explosion due to flammable chemicals and the risk of effects of chemicals on the respiratory system, such as numbing of the senses or loss of consciousness. Id. The court also noted that a finding of exigency was also supported by the fact that police were aware of other indicia that methamphetamine was being manufactured, aside from the smell of ether. Id.

The circumstances in this case are similar to those in Crabb and require the same conclusion. When Officer Simpson approached the VanKuren residence, he was met with a chemical odor of such potency that it caused his eyes to water and forced him to take a few steps away from the door. It was an odor that he associated with the manufacturing of methamphetamine. Further, Officer Simpson could see silhouettes through the front window and thus knew that more than one person was inside. Evidence was presented at the suppression hearing that Officer Simpson knew of the dangers associated with manufacturing methamphetamine, including the risk of fire or explosion and the risk of exposure to chemicals used in the manufacturing of methamphetamine.

7

Under these circumstances, the officers had an objectively reasonable basis for believing that a threat to safety existed, and thus, the Fourth Amendment was not violated.

Peelman attempts to distinguish the facts in this case from those in Crabb. First, he argues this case is different because there is no corroborating evidence from neighbors regarding an odor emanating from the house. This is no more than a request that we find Officer Simpson's testimony incredible with respect to his description of the odor. However, the trial court clearly credited and relied upon Officer Simpson's testimony in its order denying Peelman's motion to suppress, and we decline to second-guess the fact-finder in the way that Peelman desires. See Montgomery, 904 N.E.2d at 377.

Second, Peelman asserts that "there was no testimony or other evidence from officers indicating that they legitimately feared for the safety of individuals in or around the premises" and the "officers act[ed] only on their desire to obtain evidence . . . ." Appellant's Brief at 11. Peelman's argument on this point is a red herring. Even if it were true that the officers entered the house solely based upon a desire to obtain evidence without any consideration of safety, it would be irrelevant to the Fourth Amendment analysis. As the Supreme Court has stated, it is well-settled that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action. The officer's subjective motivation is irrelevant." Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006) (citations and quotation marks omitted) (emphasis in original). The circumstances of this case, viewed objectively, support the proposition that the officers could reasonably believe that the dangers of manufacturing methamphetamine presented a threat to the safety of individuals in the house.

8

Finally, Peelman points out that this court noted in <u>Crabb</u> that it was "not ready to draw a bright line which would allow officers to enter a home without a warrant based solely on the smell of ether." <u>Crabb</u>, 835 N.E.2d at 1071. We do not believe that this case draws such a bright line. Before ever arriving at the VanKuren residence and experiencing the chemical odor emanating from the house, the officers in this case had evidence from the Taulbees which led them to suspect methamphetamine was being manufactured in the house. Moreover, the silhouettes observed by the officers indicated that multiple persons were inside the house. The exigency existing in this case is a result of the totality of these circumstances and is not based solely on the smell of a chemical odor associated with the manufacturing of methamphetamine.[2]

In sum, we hold that the circumstances of this case justified the warrantless entry of VanKuren's home under the exigent circumstances exception to the Fourth Amendment's warrant requirement.

## C. Article 1, Section 11 of the Indiana Constitution

Peelman also contends that the search violated Article 1, Section 11 of the Indiana Constitution. With language nearly identical to the Fourth Amendment, Article 1, Section 11 provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

---

[2] Like the court in <u>Crabb</u>, which wished to limit any future extension of its holding, we, too, believe that evidence of a person's presence in the home (i.e. evidence that someone is subject to the threat of danger) and corroborating evidence of methamphetamine manufacturing, in addition to a chemical odor, must be present to create exigent circumstances justifying the warrantless entry into a home.

9

Under the Indiana Constitution, the constitutionality of a search turns on an evaluation of police conduct under the totality of the circumstances. Litchfield v. State, 824 N.E.2d 356, 359 (Ind. 2005). The reasonableness of a search or seizure is determined by balancing "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." Id. at 361.

With respect to the degree of concern, suspicion, or knowledge that a violation has occurred, we believe that this factor weighs in favor of finding the search to be reasonable. The police arrived at the VanKuren residence with information from the Taulbees that the occupiers of the house were involved in suspicious (and illegal) purchasing of pseudoephedrine, a primary ingredient used to manufacture methamphetamine. This suspicion was bolstered upon arrival at the residence when the officers detected a chemical odor coming from the house which they knew to be associated with the manufacturing of methamphetamine. This evidence gave the officers probable cause to believe a violation of the law was occurring inside the home. See, e.g., VanWinkle v. State, 764 N.E.2d 258, 264-65 (Ind. Ct. App. 2002) (odor associated with manufacturing methamphetamine, along with other evidence, constituted probable cause), trans. denied; State v. Hawkins, 766 N.E.2d 749, 752 (Ind. Ct. App. 2002) (odor of marijuana detected by experienced officer was sufficient to constitute probable cause for a search), trans. denied.

Next, we consider the degree of intrusion the search imposed on Peelman's ordinary activities. We recognize that the intrusion in this case was a warrantless entry into a home, which is presumptively unreasonable. Krise v. State, 746 N.E.2d 957, 962

(Ind. 2001). That said, while it was a home that the police intruded upon, it was not Peelman's home. Peelman was, at best, a guest in the house and, at worst, visiting for the sole purpose of furthering illegal activity. Moreover, he was in the house only approximately twenty minutes before the police arrived. We believe these facts turn what is otherwise a presumptively invasive search into a less intrusive invasion on Peelman's privacy interests. Cf. Minnesota v. Carter, 525 U.S. 83, 90-91 (1998) (defendant who was in another person's apartment for a short time and for the sole purpose of packaging cocaine did not have a legitimate expectation of privacy in the apartment). The Indiana Supreme Court has said a person's right under Section 11 is a "personal right" and "a defendant cannot successfully object to a search of the premises of another if such search does not unlawfully invade his own privacy." Peterson v. State, 674 N.E.2d 528, 533-34 (Ind. 1996), cert. denied, 522 U.S. 1078 (1998). And although these statements were made in the context of standing under the Indiana Constitution, we believe that such a consideration of a defendant's interest in the place searched is relevant in determining the reasonableness of the search as it pertains to the degree of intrusion.

Furthermore, our supreme court has intimated that the reasonableness of a search depends upon whether the search is conducted based on arbitrary selection of the subject or on individualized suspicion. Litchfield, 824 N.E.2d at 360-61. Here, the police were not arbitrarily walking up to houses and busting down doors in hopes that they catch a whiff of chemicals or marijuana. Rather, the officers' decision to visit the VanKuren residence and ultimately enter the premises was based on evidence that led them to suspect illegal activity was occurring specifically at that residence.

11

Finally, we consider the extent of law enforcement needs in this case, which we believe were significant. As discussed above, the circumstances of this case provided the officers with an objectively reasonable basis for believing a threat to human safety existed. Such concerns for public safety are equally important in our analysis under the Indiana Constitution. "It is because of concerns among citizens about safety, security, and protection that some intrusions upon privacy are tolerated, so long as they are reasonably aimed toward those concerns." Montgomery, 904 N.E.2d at 382 (quoting Holder v. State, 847 N.E.2d 930, 940 (Ind. 2006)). In addition to general concerns for safety, it is also relevant that this court has previously acknowledged that "methamphetamine production and use have rapidly become plagues in our communities and . . . law enforcement is inundated with new challenges related to methamphetamine." Crabb, 835 N.E.2d at 1071. Unfortunately, Indiana and its residents continue to be victims of that plague.[3]

Under the totality of the circumstances, we hold that the search challenged in this case was not unreasonable and thus did not violate Article 1, Section 11 of the Indiana Constitution.

## II. Sufficiency of the Evidence

### A. Standard of Review

Peelman maintains that there was insufficient evidence presented at trial to support his convictions for dealing in methamphetamine and conspiracy to commit the same. When reviewing a defendant's claim of insufficient evidence, the reviewing court will

---

[3] See Missouri, Tennessee, Indiana, and Kentucky account for nearly half of US meth incidents in 2012, NOLA.COM (Sept. 12, 2013), http://www.nola.com/news/index.ssf/2013/09/breaking_good_us_meth_lab_seiz.html; Brittany Tyner, Meth lab numbers on target for record-breaking year, WLFI.COM (Aug. 30, 2013, 9:54 AM), http://www.wlfi.com/news/local/meth-lab-numbers-on-target-for-record-breaking-year.

neither reweigh the evidence nor judge the credibility of the witnesses, and we must respect "the jury's exclusive province to weigh conflicting evidence." McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005) (citation omitted). We consider only the probative evidence and reasonable inferences supporting the verdict. Id. And we must affirm "if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt." Id. (citation omitted).

### B. Dealing in Methamphetamine

A person commits dealing in methamphetamine when he "knowingly or intentionally . . . manufactures . . . [or] possesses, with intent to . . . manufacture . . . methamphetamine, pure or adulterated . . . ." Ind. Code § 35-48-4-1.1(a).[4] The term "manufacture" includes the production, preparation or processing of a controlled substance. Ind. Code § 35-48-1-18. We have held it is not necessary that the process be completed or that a final product actually exist before the statute can be applied. Traylor v. State, 817 N.E.2d 611, 619 (Ind. Ct. App. 2004), trans. denied.

Peelman presents us with a single argument attacking the sufficiency of the State's evidence at trial; namely, Peelman maintains the evidence did not prove that he was involved in the manufacturing of methamphetamine or that he had possession or control of the precursors found at VanKuren's residence. We are not persuaded by this argument.

---

[4] In this case, Peelman's crimes were Class A felonies, because his acts were committed within 1000 feet of a family housing complex. See Ind. Code § 35-48-4-1.1(b).

13

Absent actual possession, evidence of constructive possession is sufficient to support a conviction for a drug offense. Crocker v. State, 989 N.E.2d 812, 822 (Ind. Ct. App. 2013), trans. denied. Constructive possession occurs if a person has the intent and the capability to maintain dominion and control over the contraband. Id. To prove the intent element of constructive possession, the State must demonstrate the defendant's knowledge of the presence of the contraband, which may be inferred from either (1) the exclusive dominion and control over the premises containing the contraband or (2) "if the control is non-exclusive, evidence of additional circumstances pointing to the defendant's knowledge of the presence of the contraband." Id. Here, circumstantial evidence suggests that Peelman had knowledge of the contraband's presence in the house.

First, Officer Simpson testified that there was an intense chemical odor, associated with manufacturing methamphetamine, which emanated from and permeated through the house. One could infer that Peelman was aware of this odor and thus aware of the activities conducted inside the house that caused it. Second, although some of the seized evidence was found in closed cabinets, several pieces of evidence related to manufacturing methamphetamine were found in plain view, including camping fuel, fuel additive, pseudoephedrine pills, and cut up lithium batteries. Moreover, the cut up lithium batteries were found in the same room in which Peelman was hiding after the police arrived.

Furthermore, evidence presented at trial showed that Peelman was present at Walmart at the same time the other three suspects were purchasing the precursors; Peelman rode to Walmart with VanKuren; and Peelman spoke to McFadden while at Walmart. Additionally, several text messages between Peelman, VanKuren, and

14

McFadden discuss going to Walmart to purchase camping fuel and lithium batteries for Peelman. And finally, Joyce Taulbee had told Officer Schmidt that she had sold the pseudoephedrine she purchased to someone named "Chris." Transcript at 93.

Lastly, we believe the evidence shows that Peelman was capable of exerting control over the precursors. Much of the evidence was in plain view, and some was found in the same room in which Peelman was found hiding. Nothing suggests that Peelman did not have access to the precursors or that he was confined to the back bedroom in which the police found him. Further, the evidence supports the inference that some—if not all—of the precursors found at the house were purchased on Peelman's behalf.

Together, this evidence is enough to prove Peelman had constructive possession of the contraband. Therefore, we conclude that the evidence was sufficient to support Peelman's conviction of dealing in methamphetamine.[5]

### III. Peelman's Sentence

Finally, Peelman challenges the imposition of his thirty-eight year aggregate sentence. Specifically, he argues that the trial court abused its discretion by considering an improper aggravating circumstance and refusing to consider other factors that Peelman believes are mitigating. He also argues his sentence is inappropriate in light of his character and the nature of his offense.

---

[5] Aside from his argument regarding constructive possession, Peelman offers no separate argument that there was not sufficient evidence to support his conspiracy conviction and thus has forfeited any argument on that issue. See Smith v. State, 822 N.E.2d 193, 202-03 (Ind. Ct. App. 2005), trans. denied.

A. Abuse of Discretion

First, we address Peelman's contention that the trial court abused its discretion. [S]entencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion." Anglemyer v. State, 868 N.E.2d 482, 490 (Ind. 2007), clarified on reh'g, 875 N.E.2d 218 (Ind. 2007). The trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances. Id. The trial court may abuse its discretion in sentencing by:

> (1) failing to enter a sentencing statement, (2) entering a sentencing statement that explains reasons for imposing the sentence but the record does not support the reasons, (3) the sentencing statement omits reasons that are clearly supported by the record and advanced for consideration, or (4) the reasons given in the sentencing statement are improper as a matter of law.

Kimbrough v. State, 979 N.E.2d 625, 628 (Ind. 2012) (citing Anglemyer, 868 N.E.2d at 490-91).

Peelman contends that the trial court abused its discretion by failing to consider evidence of mitigating circumstances, including his age (29), his drug addiction, family support, and the effect his incarceration would have on his young child—all of which were offered for the trial court's consideration. However, none of the circumstances argued by Peelman is significant and clearly supported by the record. With respect to Peelman's age and family support, the trial court noted at the sentencing hearing that Peelman has been a constant offender and drug abuser since the age of seventeen, despite any support from friends or family. As to any hardship on Peelman's child, the evidence indicated that the child's mother had primary custody of the child and that Peelman was behind on child support payments. Further, the hardship on Peelman's child would

16

essentially be the same under any significant amount of incarceration, even if he had received the minimum twenty year sentence. See Battles v. State, 688 N.E.2d 1230, 1237 (Ind. 1997).

Second, Peelman argues that it was improper to consider that Peelman's actions "brought others into" a criminal enterprise as an aggravator, because agreement to engage in a criminal venture is a material element of conspiracy. Appellant's Appendix at 202. In Anglemyer, the court said that an abuse of discretion requires remand for re-sentencing only "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." 868 N.E.2d at 491. Here, the trial court also considered Peelman's prior criminal history and the fact that he was on probation at the time of the offence as aggravators. We believe these aggravators are sufficient to support Peelman's thirty-eight year sentence, even without considering the challenged aggravator. Thus, we do not find any reversible error here.

B.  Inappropriate Sentence

Next, Peelman argues that his sentence is inappropriate in light of his character. Indiana Appellate Rule 7(B) gives reviewing courts the authority to revise a defendant's sentence if, "after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." It is the defendant's burden to persuade the reviewing court that the sentence is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

When considering the character of the offender, the defendant's criminal history is a relevant factor. Johnson v. State, 986 N.E.2d 852, 857 (Ind. Ct. App. 2013). Here, Peelman has a significant criminal history. Over an eleven year period, he has racked up

17

eleven convictions, eight of which are felonies. Peelman has also had recent arrests in both Indiana and Kentucky relating to manufacturing methamphetamine. In addition, he has had a number of probation violations and was on probation at the time of this particular offense.

While Peelman's thirty-eight year aggregate sentence exceeds the advisory sentence of thirty years for a Class A felony, we note that the maximum sentence is fifty years. We believe that his lengthy criminal history supports the enhancement in this case.[6] We hold that Peelman has not met his burden of showing that his sentence was inappropriate.

Conclusion

Concluding that Peelman's rights under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution were not violated; there was sufficient evidence to sustain his convictions; and Peelman's sentence was neither an abuse of discretion nor inappropriate, we affirm.

Affirmed.

RILEY, J., and KIRSCH, J., concur.

---

[6] We note that Peelman makes no argument that the nature of his offense warrants a finding that his sentence is inappropriate.